## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1)  CHRISTOPHER SNIDER, on behalf of the Seventy Seven Energy Inc. Retirement & Savings Plan and a class of similarly situated participants of the Plan, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No.:  CIV-20-977-F |
| v. | ) ) | |
| (1)  ADMINISTRATIVE COMMITTEE, SEVENTY SEVEN ENERGY, INC. RETIREMENT & SAVINGS PLAN | ) ) ) ) | JURY TRIAL DEMANDED |
| (2)  CARY BAETZ; | ) ) | |
| (3)  KARL BLANCHARD; | ) ) | |
| (4)  CHRISTIN BORDEN; | ) ) | |
| (5)  LINDA CLARK; | ) ) | |
| (6)  CLINT CLOVER; | ) ) | |
| (7)  GINO DEMARCO; | ) ) | |
| (8)  LANCE HAFFNER; and | ) ) | |
| (9)  JEROME LOUGHRIDGE. | ) ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Christopher Snider ("Plaintiff"), on behalf of the Seventy Seven Energy LLC Retirement & Savings Plan f/k/a the Seventy Seven Energy Inc. Retirement & Savings Plan (the "Plan") and a class of similarly situated participants in the Plan, brings this action against the Administrative Committee, Seventy Seven Energy, Inc. Savings &

1

Retirement Plan (the "Committee") and the individual members of the Committee, Cary Baetz, Karl Blanchard, Christin Borden, Linda Clark, Clint Clover, Gino DeMarco, Lance Haffner and Jerome Loughridge, (collectively, "Defendants"), pursuant to §§ 404, 405, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109 and 1132.

## NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.     Plaintiff, a participant in the Plan during the Class Period, brings this action concerning the Plan's imprudent investment in the common stock of Chesapeake Energy Corporation ("Chesapeake") on behalf of the Plan and on behalf of a class of all participants in the Plan whose retirement assets were invested in Chesapeake from July 1, 2014, to December 31, 2017 (the "Class Period"), when the Plan merged into a different retirement plan with different fiduciaries.  Defendants' decision to retain Chesapeake stock as a Plan investment violation ERISA in three interrelated ways.

2.     First, Defendants breached their duty of prudence by failing to evaluate Chesapeake stock and remove it as a Plan investment on Day 1 when it should have been clear from that it was not a prudent investment option for the Plan, and by deciding to purchase *additional* shares of Chesapeake Stock during the Class Period.  As a fund invested in the stock of a single company, the fund was substantially more risky than diversified fund options.  There was no reason for Defendants to believe that Chesapeake stock would *outperform* the market — and thus, outperform less risky, diversified investment funds that the Plan offered and were available in the marketplace.  Rather than reflecting a considered, prudent investment strategy, Defendants erroneously believed that

a continued investment in Chesapeake stock was permissible because they apparently believed it was an "employer security" under ERISA.  Moreover, Defendants did not even have an investment policy or guidelines to select or monitor the Plan's investments, including Chesapeake stock.

3.    Second, Defendants breached their fiduciary duty by failing to **monitor** Chesapeake stock throughout the Class Period and remove it as an imprudent investment option for the Plan.  Because the Chesapeake Stock Fund was undiversified and held a large percentage of the Plan's total assets, it represented a huge concentration risk for the Plan and its participants — one that could only be justified if there was some reason to believe that Chesapeake stock would outperform prudent, diversified investment options.  At no point during the Class Period was this the case.  Despite recognizing that investing in a single company's stock was "not diversified and exposes investors to a higher risk of loss," Defendants allowed the Plan to invest **44%** its assets in Chesapeake stock and let the Plan buy millions dollars of additional shares during the Class Period.  The Plan was even less diversified because of its substantial investment in the stock of Seventy Seven Energy ("SSE"), a company that is also in the oil industry whose performance was highly correlated to Chesapeake's success.  While Defendants removed other funds from the Plan's investment line-up, they took no steps to liquidate the Plan's massive, risky bet on Chesapeake stock or mitigate the Plan's lack of diversification.  Defendants sat by idly as the share price of Chesapeake stock declined over **86 percent** during the Class Period, from $29 to $4, causing the Plan's participants to lose tens of millions of dollars in retirement savings.

3

4.     Third, Defendants violated their duty under ERISA to diversify the Plan's investments to minimize the risk of large losses.  Chesapeake stock represented 44% of the Plan's assets when the Defendants became fiduciaries and more than 30% of the Plan's assets on December 31, 2014, when the Plan's concentration in Chesapeake stock was larger than the Plan's next five highest holdings **combined**.  These concentration levels are far too great for a retirement plan and caused Plan participants to suffer the kind of "large losses" that ERISA requires fiduciaries to take actions to prevent, particularly given the Plan's other investments.

5.     As a result of these breaches, each Defendant is liable to the Plan for all losses resulting from each of their breaches of fiduciary duty.  Plaintiff also seeks equitable relief.

## JURISDICTION AND VENUE

6.     ***Subject Matter Jurisdiction.*** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

7.     ***Personal Jurisdiction.*** This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

8.     ***Venue.*** Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered, some or all of the fiduciary breaches for which relief is sought occurred, and one or more Defendants reside or may be found, in this district.

4

**PARTIES**

**Plaintiff**

9.       Plaintiff Christopher Snider was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held shares of Chesapeake stock in his Plan account during the Class Period.

10.       During the Class Period, the value of Chesapeake shares within Plaintiff's Plan account diminished considerably and him, like thousands of other Plan participants, suffered losses resulting from Defendants' breaches of fiduciary duty.

**Defendants**

11.       Defendant Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan is an unincorporated association with a principal place of business in Oklahoma City, Oklahoma. During the Class Period, the Committee administered the Plan and was a fiduciary of the Plan. *See* Plan's 2014 Financial Statements (ECF 45-2) at 20-21.

12.       The Committee was also a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control over management of the Plan and the management or disposition of Plan assets and/or had discretionary authority to appoint and monitor Plan fiduciaries who had control over management or disposition of Plan assets.

13.       Defendant Cary Baetz was a member of the Committee during all or part of the relevant time period and, as such, was responsible for carrying out the provisions of the Plan and a fiduciary of the Plan.

14.     Defendant Karl Blanchard was a member of the Committee during all or part of the relevant time period and, as such, was responsible for carrying out the provisions of the Plan and a fiduciary of the Plan.

15.     Defendant Christin Borden was a member of the Committee during all or part of the relevant time period and, as such, was responsible for carrying out the provisions of the Plan and a fiduciary of the Plan.

16.     Defendant Linda Clark was a member of the Committee during all or part of the relevant time period and, as such, was responsible for carrying out the provisions of the Plan and a fiduciary of the Plan.

17.     Defendant Clint Clover was a member of the Committee during all or part of the relevant time period and, as such, was responsible for carrying out the provisions of the Plan and a fiduciary of the Plan.

18.     Defendant Gino DeMarco was a member of the Committee during all or part of the relevant time period and, as such, was responsible for carrying out the provisions of the Plan and a fiduciary of the Plan.

19.     Defendant Lance Haffner was a member of the Committee during all or part of the relevant time period and, as such, was responsible for carrying out the provisions of the Plan and a fiduciary of the Plan.

20.     Defendant Jerome Loughridge was a member of the Committee during all or part of the relevant time period and, as such, was responsible for carrying out the provisions of the Plan and a fiduciary of the Plan.

## BACKGROUND

21.    SSE was previously an indirect, wholly-owned subsidiary of Chesapeake with its own officers and employees.  In March 2014, Chesapeake announced that SSE[1] would become an independent, publicly traded company through a series of transactions that the companies referred to as a "spin-off."  The spin-off closed on June 30, 2014.

22.    To effectuate the spin-off, SSE's CEO negotiated and signed a "Master Separation Agreement," the contract governing how Chesapeake and SSE would separate. Part of the Master Service Agreement was the "Employee Matters Agreement" (the "EMA"), a contract between Chesapeake and SSE governing the post-spin-off allocation of "assets, liabilities and responsibilities with respect to certain employee compensation, benefit plans and programs, and certain employment matters."  The EMA required SSE to establish and adopt a 401(k) plan and for Chesapeake to transfer from its 401(k) plan (the "CHK Plan") the assets credited to the accounts of SSE employees.  The EMA further specified that the transfer "shall, to the extent reasonably possible, be an in-kind transfer . . . " The EMA stated that SSE was responsible for "taking such actions as are deemed necessary and appropriate to comply with its own fiduciary responsibility" under ERISA. The EMA was dated June 25, 2014, five days before the spin-off.

23.    On June 24, 2014, SSE hired Delaware Charter Guarantee & Trust Company, d/b/a Principal Trust Company ("Principal Trust") to serve as the Plan's

---

[1]    Prior to the spin-off, SSE was "Chesapeake Oilfield Operating, LLC;" the name was changed to SSE as part of the spin-off.  To avoid confusion, the entity will be referred to throughout this complaint as "SSE."

directed trustee.  Three days before the spin-off, on June 27, 2014, David Treadwell, SSE's Senior Vice President, General Counsel and Secretary, signed the document establishing the Plan (the "Plan Document"), with an effective date of July 1, 2014.  The Plan Document named SSE as the Plan administrator and named fiduciary, roles which SSE delegated to the Committee.

24.    On July 1, 2014, the day after the spin-off, the CHK Plan transferred $196,210,229 in assets to the Plan. *See* Plan's 2014 Financial Statements. Of this amount, ***$87,038,874***, or ***44.3%***, was invested in Chesapeake stock.

25.    In April 2017, SSE merged with Patterson-UTI Energy, Inc.  Effective December 31, 2017, the Plan merged into the Patterson-UTI Energy, Inc. 401(k) Profit Sharing Plan (the "Patterson-UTI Plan"), with the Patterson-UTI Plan being the surviving plan.

26.    From July 1, 2014, until December 31, 2017, the Plan covered all employees of SSE (with certain limited exceptions) and its purpose was to provide a retirement income for SSE's employees.

27.    From July 1, 2014, until December 31, 2017, the Plan was an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

28.    From July 1, 2014, until December 31, 2017, the Plan was a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34) because it provided individual accounts for each participant and benefits based upon the amount contributed to the participant's account, and any income,

expenses, gains and losses, and any forfeitures of accounts of other participants which could be allocated to participants' accounts.

## SUBSTANTIVE ALLEGATIONS

I. **Defendants Breached Their Fiduciary Duties By Failing to Evaluate and Remove Chesapeake Stock As A Plan Investment Option.**

29.     Those who choose a plan's investment options are fiduciaries under ERISA because they have authority and control over a plan's assets.    ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Fiduciaries must "prudently select investments."  *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019).

30.     After the initially choosing a plan's investments, a fiduciary has "a continuing duty of some kind to monitor [them] and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).  A fiduciary "cannot assume that if investments are legal and proper for retention at the beginning of the trust, or when purchased, they will remain so indefinitely."  *Id*. (internal citations omitted).  ERISA requires fiduciaries to "systematically consider all the investments of the trust at regular intervals to ensure they are appropriate." *Id*. (internal citations omitted).  When a trust includes inappropriate investments, a fiduciary ***must dispose of them*** within a reasonable time.  *Id*. (emphasis added).

31.     "Investigation of the merits of a particular investment as at the heart of the prudent person standard."  *Sweda*, 923 F.3d at 928 (internal citations omitted).  When evaluating investment options, a fiduciary must consider "the circumstances then prevailing" and act as a prudent person "***familiar with such matters*** would use in the

conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B) (emphasis added); *see also* 29 C.F.R. § 2550-404a-1(b)(1)(i) (fiduciaries must give "appropriate consideration to those facts and circumstances that . . . the fiduciary knows or should know are relevant to the particular investment or investment course of action involved").

32.    For a 401(k) plan like the Plan, fiduciaries must seek "(1) to maximize retirement savings for participants while (2) avoiding unnecessary risk." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467–68 (2014).

**A.    Defendants Should Have Immediately Reviewed The Plan's Entire Investment Lineup When They Became Fiduciaries.**

33.    Upon the Plan's effective date of July 1, 2014, Defendants became responsible for monitoring the Plan's investment options, including the Chesapeake stock, and removing imprudent investments.  Defendants owed Plan participants a fiduciary duty while performing these functions.  *Sweda*, 923 F.3d at 328 (internal citations omitted). The Plan Document gave Defendants "complete control over of the administration of the Plan" and "all powers necessary…to properly carry out its administrative duties.  Plan Document (ECF 45-3) at § 9.01.  Given the Defendants' great responsibilities, the Plan Document required Defendants to "review all pertinent Employee information and Plan data . . . to determine appropriate methods for carrying out the Plan's objectives." *See* Plan Document (ECF 45-3) at § 4.01.  Simply put, Defendants were required to know why the Plan offered each investment and to ensure that each option was prudent.

34.     Defendants should have used these powers on Day 1 to review the Plan's initial slate of investments to ensure that *each* was prudent and furthered the Plan's goals of maximizing participants' retirement savings while avoid necessary risk. *Dudenhoeffer*, 134 S. Ct. at 2467–68 (2014).

35.     A critical first step in this process was for Defendants to gather the pertinent facts about each investment so they could decide whether the Plan should continue to offer them.  29 C.F.R. § 2550-404a-1(b)(1)(i) (fiduciaries must give "appropriate consideration to those facts and circumstances that . . . the fiduciary knows or should know are relevant to the particular investment or investment course of action involved").

36.     This review process is required of *all* fiduciaries of 401(k) plans.  *Tibble*, 135 S. Ct. at 1828–29.  But Defendants had a heightened obligation to conduct this review because of the numerous "red flags" that existed when they became fiduciaries.  First, while SSE classified it as a "spin-off," the Plan was a new plan.  The Plan was sponsored by a different company than the CHK Plan and the two plans did not have the same participants or goals.

37.     Second, SSE decided that the Plan should initially offer the same investments as the CHK Plan *without* an investment policy statement, guidelines governing investments or advice from an independent investment manager.  Thus, when Defendants became fiduciaries, SSE had *not* investigated whether it was prudent for the Plan to invest in Chesapeake stock.  It was Defendants' responsibility to do so.

38.     Third, the Plan offered an undiversified, single-stock fund for a company, Chesapeake, that did *not* employ the Plan's participants.  Non-employer single stock funds

11

are rare for 401(k) plans.  *See*, *e.g.*, *Tatum v. R.J. Reynolds Tobacco Co. et al.*, No. 1:02-cv-373, 2016 WL 660902, at * 13 (M.D.N.C. Feb. 16, 2016) (only twelve 401(k) plans out of 10,000 had non-employer stock funds).  The Chesapeake stock fund was facially different than the Plan's other, non-ESOP investments options which were diversified mutual funds and a stable value fund.

39.    Fourth, more than **44%** of the Plan's assets were invested in Chesapeake stock when the spin-off occurred.  This level of investment concentration in a single-sector fund, let alone a fund invested in only ***one company***, is excessive for a 401(k) plan and should have been a clear signal to Defendants that they needed to investigate whether the Plan should continue to offer Chesapeake stock as an investment.  *Tatum*, 2016 WL 660902, at * 13 (stating that a prudent fiduciary would consider a concentrated investment in a single security to be "troublesome, scary.").

40.    A prudent fiduciary faced with these circumstances would have immediately reviewed the Plan's investment lineup to determine whether each fund was prudent and served the Plan's goals.  Defendants did ***not*** conduct this required investigation.  They did not, for example, independently assess the Plan's investments or hire an investment manager to advise them on what to do or the market might react if the Plan divested its holdings of Chesapeake stock.

**B.    If Defendants Had Properly Reviewed The Plan's Investment Lineup When The Plan Became Effective, They Would Have Immediately Removed The Chesapeake Stock.**

41.    After the fiduciaries gather the relevant information about an investment option, they must evaluate whether it should remain in the plan.  Relevant considerations include if the investment serves the plan's stated goals and the investment's role in the "plan's investment portfolio."  29 C.F.R. § 2550-404a-1(b)(b).  As described below, if Defendants had conducted a proper investigation, they would have determined that Chesapeake stock was *not* a prudent investment option for the Plan and removed it from the Plan at the *earliest possible date* after the spin-off.

**1.    Defendants Would Have Determined That the Plan's Holdings Of Chesapeake Stock Did Not Serve The Plan's Goals.**

42.    Chesapeake stock was an investment option in the CHK Plan's "employee stock ownership plan" ("ESOP") component.   ESOPs invest in the stock of the participants' employer, "meaning they are *not* prudently diversified."  *Dudenhoeffer*, 134 S. Ct. at 2465 (emphasis in original).   "The 'character' and 'aims' of an ESOP differ from those of an ordinary retirement investment, such as a diversified mutual fund."  *Id*. at 2467. While ordinary retirement plans seek to maximize returns and avoid excessive risk, ESOPs also seek "to promote ownership of employer stock."  *Id*. at 2468.

43.    ESOPs "invest in qualifying employer securities."  ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6).  Under ERISA § 3(5), 29 U.S.C. § 1002(5), an "employer" is "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan."  An "employer security" is a "security issued by an

employer of employees covered by the plan, or by an affiliate of such employer." ERISA § 407(d)(1), 29 U.S.C. 1107(d)(1).[2]

44.     After the spin-off, Chesapeake was not the Plan's participants' "employer" and Chesapeake stock was not an "employer security" under ERISA.  ERISA § 3(5), 29 U.S.C. § 1002(5); ERISA § 407(d)(1), 29 U.S.C. 1107(d)(1).  Moreover, the Chesapeake stock was not held in the Plan's ESOP component.  Accordingly, the reasons why the CHK Plan offered Chesapeake stock as an investment were ***not*** present for the Plan.  *See*, *e.g.*, *Dudenhoeffer*, 134 S. Ct. at 2469 (ESOPs have purposes "other than the financial security of plan participants.").  The Plan's participants' employer was SSE, not Chesapeake, and there was no reason for the Plan to promote Plan participants' investment in Chesapeake, which was an independent company.

45.     The documents underlying the Plan's formation did not support including Chesapeake stock as an investment option either.  Other than the investment in SSE through the Plan's ESOP component, the Plan Document did ***not*** require the Plan to offer any specific funds or investment types, including Chesapeake stock.  The EMA also did not require the Plan to offer Chesapeake stock and, instead, stated that the Plan's fiduciaries must adhere to their fiduciary duties under ERISA.

46.     Additionally, SSE did not include Chesapeake stock because it believed it served the Plan's goals or as part of the Plan's overall investment lineup.  SSE did not

---

[2]     Under ERISA, a "qualifying employer security" is an "employer security" that is either a stock, a marketable obligation (e.g., a bond) or an interest in a publicly traded partnership. *See* ERISA § 407(d)(5), 29 U.S.C. § 1107(d)(5).

even have "a written investment policy or guidelines" when it decided to initially offer Chesapeake stock in the Plan.

47.    Accordingly, Defendants were ***not*** restricted in their selection or monitoring of the Plan's investments and not required or even encouraged to continue the Plan's investment in Chesapeake stock.    Defendants could have, and indeed should have, determined that the Plan's investment in Chesapeake stock was imprudent because it did not serve the Plan's goals.

> **2.    Defendants Would Have Determined There Was No Reason To Expect Chesapeake Stock Would Give Participants Extraordinary Returns.**

48.    Fiduciaries of retirement plans have a duty to seek to maximize returns for participants while avoiding excessive risk. *Dudenhoeffer*, 134 S. Ct. at 2467–68.  Single stocks are, on average, four times riskier than a diversified fund (e.g., a mutual fund). *Tatum*, 2016 WL 660902, at * 13.  If Defendants had conducted a proper investigation, they would have determined that they could not have had a reasonable expectation that Chesapeake stock would produce above-average returns to compensate Plan participants for the increased risk of investing in a single-stock fund.

49.    Defendants should have been particularly aware of the risks of over-concentration because in the years before the spin-off, Chesapeake's stock was extremely volatile, experiencing wide fluctuations.  Chesapeake stock traded at $47.45 per share on June 30, 2008 but then fell to $14.96 on January 1, 2009.  The share price rose to $23.44 per share by January 1, 2010, falling and rising again throughout 2010.  The price again rose, reaching $32.50 a share on June 30, 2011, only to fall to $19.99 a share on January

1, 2012.  The price of Chesapeake stock continued to rise and fall in 2013 and its market price fluctuated between \$24 and \$29 per share in the months preceding the spin-off.[3]

50.     Chesapeake stock was, and is, traded on an efficient market and its share price is the best estimate of its value.  Accordingly, if Defendants had conducted a proper investigation, they would have determined that there was no reason to expect that Chesapeake stock would outperform the market or provide extraordinary returns beyond that of the Plan's other, diversified funds.

51.     SSE's own documents show that Defendants could ***not*** have concluded that Chesapeake stock was a prudent investment.  The Plan Prospectus (which was drafted before the spin-off) provided information about the Plan's 22 mutual fund options, summarizing each fund's strategy and listing their rates of return in 2011, 2012 and 2013. Compared to these ***diversified*** investment options, Chesapeake had the ***lowest*** cumulative returns and was the ***only*** option to have 2 years of double-digit losses.  Simply put, the Chesapeake stock was an outlier for the Plan: a non-diverse, single stock fund with high risk and poor returns.

52.     If they had adhered to their ERISA-mandated duties under *Tibble*, Defendants would have determined that Chesapeake stock was not a prudent investment

---

[3]     These swings made Chesapeake stock a risky investment by objective measures. "Beta" is a measure of a stock's volatility in relation to the market. The stock market as a whole has a beta score of 1.0 and individual stocks are scored according to how much they deviate from the market. A stock whose price is more volatile than the market has a beta score greater than 1.0 and one whose price is less volatile has a score less than 1.0.  *See* http://www.investopedia.com/articles/stocks/04/113004.asp.

option for the Plan and would have liquidated the Plan's holdings in it at the earliest possible date following the spin-off.

### 3. Defendants Would Have Determined That They Needed To Diversify The Plan's Investments.

53.     ERISA fiduciaries have a "continuing duty" to review the prudence of each investment "to ensure they are appropriate." *Tibble*, 134 S. Ct. at 1829.  Part of this duty is ensuring that the plan's assets are diversified because diversification is an essential element of prudent investing.  *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 406 (7th Cir. 2006).  ERISA requires fiduciaries to diversify the plan's investments "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." *See* ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C). ERISA's legislative history indicates that a fiduciary should not invest an "unreasonably large percentage" of plan assets in a "single security," in "one type of security," or in "various types of securities that are dependent upon success of one enterprise or upon conditions in one locality." *See* ERISA Conference Report on H.R. 2, H.R. Rep. No. 1280, 93d Cong., 2d Sess. 300, 304 (Aug. 12, 1974).

54.     Because the value of any single stock is tied to the fortunes of one company, holding a single stock is unduly risky.  By contrast, investors with a diverse portfolio of stocks and bonds face less risk because they have only a small stake in each company. *See* N. Gregory Mankiw, Principles of Economics 546 (1998); *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 415 (4th Cir. 2007); *Steinman v. Hicks*, 352 F.3d 1101, 1104 (7th Cir. 2003).

55.     When the spin-off occurred, the Chesapeake stock fund was undiversified since it was entirely invested in one company.  The Plan *as a whole* was also undiversified because *44.3%* of the Plan's assets were invested in Chesapeake stock.

56.     A 44% investment concentration in one *industry* is excessive. By comparison, a mutual fund must expressly disclose to investors if it is going to invest 25% of its assets in one industry because investments at greater percentages "could expose investors to additional risks." *See* Investment Company Release No. 23064, 63 Fed. Reg. 13,916 at 13,927 (Mar. 23, 1998). Here, not only was the Plan's investment over-concentrated in one industry, it was over-concentrated in *one company* whose share price was historically volatile as described above.

57.     One way of quantifying this excessive risk is by virtue of the annualized standard deviation (volatility) of daily returns of Chesapeake stock compared with diversified equity alternatives. Over the 10 year period ending June 30, 2014, the annualized standard deviation of daily returns of Chesapeake stock was 47.9, while over the same period the same measure for the S&P 500 Index was less than half that — only 20.4%.

58.     Since the price of Chesapeake represents the market's best-estimate of the value of its stock, there would be no reason to expect Chesapeake stock would outperform the market — let alone outperform the market price by enough to justify doubling the risk.

59.     Indeed, there were reasons to expect Chesapeake stock would continue to be more volatile than most individual securities and far more volatile than prudently diversified alternatives. For example, Chesapeake's bonds were considered below

investment grade—aka "junk"—before and after the spin-off of Seventy Seven. Until May 2014, Standard & Poor's rated the company's long-term, unsecured debt at BB-, which is speculative and thus, below investment grade. Although S&P then upgraded the bonds to BB+, they still remained "junk". By October of 2015, S&P downgraded Chesapeake's debt back to BB-. Similarly, Moody's rated Chesapeake's debt Ba3 (junk) until May 2014, at which point it upgraded the rating to Ba1, still below investment grade. The rating remained Ba1 until October 2015, when it again fell to Ba3.

60.    It does not matter whether this volatility was incorporated into the price of the stock. Defendants had duties to avoid large losses and to make prudent decisions of the type made by diligent experts make decisions in similar plans — almost none of which permit their plans to invest in single securities (except where excused from the duties of prudence and diversification for qualified employer security) and none of which permit their plans to invest in Chesapeake stock — let alone in such high concentration.

61.    If Defendants had conducted a proper investigation at the time of the spin-off in accordance with their fiduciary duties, they would have determined that the Plan was dangerously over-concentrated and liquidated the Chesapeake stock to minimize the Plan's risk of large losses and that a prudent man acting in like capacity would have removed liquidated the Chesapeake stock.

62.    The immediate sale of Chesapeake stock would not have raised any red flags in the investment market or caused any adverse response. The Plan's holdings of Chesapeake represented less than .5% of Chesapeake's total outstanding shares.  If anything, it would have been positive as Defendants would have announced that they had

decided to sell the Chesapeake stock because Chesapeake was no longer the "employer" of the Plan's participants, and the stock was not a good fit for the Plan's investment lineup. ERISA § 3(5), 29 U.S.C. § 1002(5). Alternatively, Defendants could have adopted a procedure for the Plan to liquidate its investment in Chesapeake stock over a short period of time.

### C. Defendants Should Have Reviewed The Plan's Investment In Chesapeake Stock Throughout The Class Period.

63. Defendants further breached their fiduciary duties by failing to monitor the Plan's investment in Chesapeake stock after the spin-off as part of their normal review of the Plan's investments. As described above, a fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "*cannot* assume" that investments that may have once been prudent will remain so "indefinitely." *Tibble*, 135 S. Ct. at 1829 (emphasis added). Defendants had all of the duties and responsibilities alleged in Sections I.A. and A.B., above, concerning the review of the Plan's investments on an ongoing basis during the Class Period.

64. In addition to these duties under *Tibble*, the Plan Document required Defendants to "all pertinent Employee information and Plan data . . . to determine appropriate methods for carrying out the Plan's objectives." *See* Plan Document (ECF 45-3) at § 4.01; *see also* Plan Prospectus (ECF 45-4) at p. 10 ("From time to time, we may add, remove or change the investment options available to you.").

### 1. Defendants Had No Reason To Expect That Chesapeake Stock Would Provide Extraordinary Returns Throughout The Class Period.

65.     For all of the reasons alleged in Sections I.A. and I.B., above, Defendants failed to properly monitor the Plan's investment in Chesapeake stock throughout the Class Period.   While Defendants may have held meetings or reviewed various pieces of information, they failed to act, even though facts continued to demonstrate that the risk the Plan assumed with its enormous investment in a single-stock fund could not be justified by any expectation of above-average returns.

66.     For all of the reasons alleged in Sections I.A. and I.B., above, Defendants had no reason to expect that Chesapeake stock would provide Plan participants with above-market returns throughout the Class Period.   To the contrary, after the spin-off, Chesapeake's share price fell by *25%*, from $29 to $22 a share, between July 1, 2014 and October 2, 2014.   Its share price dropped another $2 per share by the end of 2014, as market news provided that the prices of oil and natural gas — the core of Chesapeake's business — were expected to remain low for the considerable future, negatively impacting the price of Chesapeake's stock. *See* http://www.eia.gov/forecasts/steo/archives/dec14.pdf at p. 3; *see also* http://blogs.ft.com/nick-butler/2015/01/04/after-the-oil-price-fall-is-natural-gas-next/.

67.     Chesapeake's 10-K for the year ending December 31, 2014, recognized that the low prices for oil and natural gas would significantly impact the company's bottom line. Chesapeake told investors that continued low prices would deplete the cash it had available for capital expenditures (*e.g.*, the exploration of new wells) and hurt its ability to borrow money and raise capital, all of which "could have a material adverse effect on our

financial condition, results of operations and reserves." *See* Chesapeake's 2014 10-K at p. 23. Chesapeake "urged" investors to consider these risks. *Id*.  Defendants did *not* do so.

68.    They did not remove Chesapeake as a Plan investment or otherwise act as the price of Chesapeake plummeted.  Instead, Defendants caused the Plan to acquire *more* Chesapeake stock throughout 2014 and 2015. *See* Plan's 2014 Financial Statements at Schedule H, Line 4j and Plan's 2015 Financial Statements (ECF 45-8) at 40.

69.    Defendants' inaction was especially egregious given Chesapeake stock's performance against its benchmark, the S&P 500.  In 2014, the price of Chesapeake stock fell by *26%* while the S&P 500 index increased by over *13%*.  The returns of the S&P 500 *far exceeded* Chesapeake stock, and the S&P 500 is fully diversified.  By continuing to invest in Chesapeake stock, Defendants caused Plan participants to incur uncompensated risk, leading to the loss of tens of millions of dollars in their retirement savings.

70.    The Plan's massive, overly-concentrated holding of Chesapeake stock significantly contributed to the Plan's losses. The Plan's interest in Chesapeake stock dropped in value by *$23,662,465* between July 1, 2014, and December 31, 2014, yet remained by far the Plan's largest investment. As of December 31, 2014, the Plan held $54,520,418 in Chesapeake stock, which was nearly *4x* its investment in its next largest holding, a fully diversified Vanguard mutual fund.

71.    Things became so bad for Chesapeake in 2015 that analysts labeled it as one of the "7 indebted oil stocks made for energy risk-takers." *See* http://finance.yahoo.com/news/7-risk-oil-stocks-may-120000546.html.  Defendants,  as prudent fiduciaries, should not have allowed the Plan to remain heavily invested in a stock

for "energy risk takers."  An investment that might be acceptable for a vulture capital fund, willing to take large risks in search for large returns, is not appropriate for a retirement fund.

72.     In May 2015, Chesapeake's share price dropped another 19.4%, ending at approximately $14 a share.  The Plan's "Investment Option Summary as of 9/30/2015" [ECF 45-9 at p. 16] showed that Chesapeake stock had significantly underperformed its benchmark, the S&P 500, in each applicable period:

|  | Year to Date Returns | 1 Year Returns | 3 Year Returns | 5 Year Returns | 10 Year Returns |
|---|---|---|---|---|---|
| Chesapeake Stock | -61.65% | -66.97% | -22.55% | -16.15 | -11.86% |
| S&P 500 Index | 5.29% | -.61% | 12.40% | 13.34% | 6.80% |

73.     Chesapeake stock's dreadful performance — especially when compared to its benchmark — should have been a sign to Defendants that it was an imprudent investment for the Plan.

74.     The price of Chesapeake stock declined through October 30, 2015, ending at approximately $7.00 a share.  During this time, Chesapeake fired 1/6th of its employees and announced that it would not pay investors dividends for the first time in 14 years.  *See* https://www.bloomberg.com/news/articles/2015-10-01/chesapeake-bonds-crater-on-new-debt-leeway-in-amended-revolver.

75.     In November 2015, Chesapeake's share price dropped another 30% over concerns the company was "burning through cash, which is putting even more pressure on

its weak balance sheet." *See* http://www.fool.com/investing/general/2015/12/07/debt-worries-send-chesapeake-energy-corporations-s.aspx. Investors were "growing gravely concerned with Chesapeake's ability to manage its debt given the persistent weakness in oil and gas prices." The Plan, a Chesapeake investor, did not share these "grave" concerns about Chesapeake's plummeting share price or how it would affect Plan participants' retirement savings. Defendants, despite the ability to do so, did not remove Chesapeake stock from the Plan.

76.    Chesapeake's 10-K for the year ending December 31, 2015 also showed a bleak future for its shareholders. Even with the numerous hedge positions it took to account for what it called the "volatility of the energy markets," Chesapeake predicted its "2016 revenue and results of operations (were) expected to be below 2015 levels." *See* Chesapeake's 2015 10-K at 22.

77.    Significantly contributing to Chesapeake's financial problems was its massive debt level. Chesapeake plainly told investors that it had "a significant amount of indebtedness" and that it "may have difficulty paying our debts as they become due." *Id*. at 23. It also told investors that its high debt "could materially adversely affect (its) business, financial condition, cash flows and results of operations and could lead to a restructuring, which *may include bankruptcy filing*." *Id*. (emphasis added).

78.    While Defendants did not remove the Chesapeake stock from the Plan, they removed *other funds* in 2015, replacing them with alternatives that the believed better served participants' interests.  These acts, while consistent with Defendants' fiduciary

duties, had a small effect on participants' retirement compared to what could have been accomplished if the Chesapeake stock had been removed timely.

79.     While the price of Chesapeake stock increased approximately $2 a share during 2016, the gains were modest compared to the massive losses that Plan participants had already suffered.  The stock had still declined by *75%* between July 1, 2014, and January 1, 2017.

80.     Things got even worse for Plan participants in 2017, as the price of Chesapeake stock fell another 43.59% when the S&P 500 increased by 21.83%.

81.     Despite these massive declines, Defendants did nothing.  They refused to liquate the Chesapeake stock out of fear that they might be held liable if the price of Chesapeake stock improved.  In doing so, they were plainly putting their own interests ahead of Plan participants, the exact opposite of what a fiduciary should do.

82.     At no time between the spin-off (June 30, 2014) and when the Plan merged into the Patterson-UTI Plan (December 31, 2017) was Chesapeake stock a prudent investment for the Plan.  Defendants ignore their ongoing duty "to monitor investments and remove imprudent ones," *Tibble*, 134 S. Ct. at 1829, sitting back idly as the price of Chesapeake stock declined, underperformed its benchmark and Plan participants lost tens of millions of dollars.  The below chart compares the performances of Chesapeake stock (- 87%) to the S&P 500 (+ 36%) during the Class Period.



83.     Defendants failed to appropriately monitor the Chesapeake stock or even consider liquidating it.  They did not hire an investment advisor, an independent fiduciary or seek guidance on what they should do.  Instead, they held the Chesapeake stock in the Plan out of their erroneous belief that they were immune from ERISA's fiduciary requirements.

84.     Defendants' decision to continue to include a single stock fund invested exclusively in Chesapeake stock, despite ever-mounting evidence that it would not even **_match_** the performance of the very benchmark Defendants were supposedly using to evaluate it, would have been bad enough on its own.  In the context of the Plan as a whole, however, Defendants' decision was made even worse because the Plan **_also_** included a another single-stock fund, the performance of which was inextricably tied to the performance of Chesapeake.  This was the Plan's **_actual_** employer stock fund, which was invested in SSE stock.  Not only was SSE, like Chesapeake, focused in the energy industry, its share price and success were directly dependent on Chesapeake.  Thus, the inclusion of

Chesapeake stock could *only* serve to undermine the diversification of the Plan's investments.

85.    For the years ending December 31, 2012, and 2013 (prior to the spin-off), Chesapeake accounted for 94% and 90%, respectively, of SSE's revenues. After the spin-off, SSE told investors that it was still "dependent on Chesapeake for a significant portion of (its) revenues." *See* SSE's 2014 10-K at 12. Thus, if Chesapeake's business declined, it would not only take down the Plan's investments in Chesapeake but would ***also*** cause the Plan's investments in SSE stock to decline.  By including the Chesapeake fund ***as well as*** its own employer stock fund, the fiduciaries magnified the Plan's concentration risk. Simply put, Defendants put far too many of the Plan's eggs in one basket.

### 2.    Defendants Needed To Ensure The Plan's Assets Were Diverse Throughout The Class Period.

86.    As alleged in Sections I.A. and I.B., above, Defendants had an ongoing duty to review the Plan's assets to ensure they were diversified under *Tibble*. ERISA requires fiduciaries to diversify the plan's investments "to minimize the risk of large losses…" ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).  At the time of the spin-off, Chesapeake stock represented more than ***44%*** of the Plan's assets, a percentage that was plainly imprudent and in violation of any commonsense investment strategy, particularly for the assets of a retirement plan.

87.    Given the Plan's excessive holding in Chesapeake stock, coupled with the Plan's concurrent investment in SSE stock and SSE's dependence on Chesapeake, a prudent fiduciary would have sold the Chesapeake stock to properly diversify the Plan's

assets and avoid be concentrated in the assets of "one company" and dependent on the success of "one enterprise."  ERISA Conference Report on H.R. 2, H.R. Rep. No. 1280, 93d Cong., 2d Sess. 300, 304 (Aug. 12, 1974).

88.    A fiduciary's duty to diversify does not apply to "employer securities." ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2).  Defendants did not monitor the Plan's concentration in Chesapeake stock because they erroneously believed it was an "employer security" after the spin-off.[4]  Accordingly, Defendants sat by idly as the Plan participants' retirement savings dramatically declined as the price of Chesapeake stock plummeted.

89.    But even if Defendants were correct in their belief that Chesapeake stock was an "employer security," the Plan's investment *still* would have been excessive.  ERISA § 407(a)(2), 29 U.S.C. § 1107(a)(2), provides that if an "employer security" is offered but not part of a plan's ESOP, the plan's holdings should not exceed "10 percent of the fair market value of the assets of the plan."  As this Court has determined, the Plan did not hold Chesapeake stock in the Plan's ESOP component.  Thus, even under Defendants' erroneous belief, the Plan's holdings of Chesapeake stock still were plainly imprudent and violated ERISA's duty to diversify.

90.    If Defendants conducted an appropriate investigation, they would have determined the Plan was not prudently diversified.  At the end of 2014, even with Plan participants contributing more than $13 million to the Plan and the sharp decline in the price of Chesapeake stock, Chesapeake stock *still* comprised more than ***30%*** of the Plan's

---

[4]    *See*, *e.g.*, the Plan's 2014 Financial Statements (ECF 45-2) at 11 (labeling Chesapeake stock as an "employer security.")

assets. *See* Plan's 2014 Financial Statements (ECF 45-2) at 16. In fact, the Plan's investment in Chesapeake was greater than the ***combined total*** of Plan's next five largest holdings at the end of 2014. *Id*. The Plan's investment in Chesapeake stock was also nearly ***4x*** its investment in its next largest holding. *Id*.

91.     Defendants made things worse by allowing the Plan to acquire ***even more*** Chesapeake stock in 2014. Between July 1, 2014, and December 31, 2014, the Plan purchased an additional $2,549,082 in Chesapeake stock. *See* 2014 Financial Statements at Schedule H, Line 4j.

92.     In 2015, the Plan purchased additional Chesapeake stock, buying $2,727,621 worth of shares. *See* 2015 Financial Statements at Schedule H, Line 4j.

93.     It was ***only*** the free-falling share price of Chesapeake stock, and not any affirmative action from Defendants, that allowed the Plan to come close to having a properly diversified allocation of assets.

**D.     Chesapeake Stock Is Not A "Qualifying Employer Security" Under ERISA**

90.     The Plan's 2014 Financial Statements incorrectly describe Chesapeake stock as an "employer security." *See* Plan's 2014 Financial Statements at p. 11 and at Schedule H, Line 4i. An "employer security" is exempt from ERISA's duty to diversify, or to take diversification into account when plan fiduciaries consider the prudence of purchasing or retaining the stock. ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2). However, Chesapeake stock was ***not*** an "employer security" for the Plan.

91.     ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6), defines the term "employee stock ownership plan" as a stock bonus plan that is "designed to invest in qualifying employer securities."

92.     ERISA § 3(5), 29 U.S.C. § 1002(5) defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan."

93.     ERISA § 407(d)(1), 29 U.S.C. 1107(d)(1), defines "employer security" as a "security issued by an employer of employees covered by the plan, or by an affiliate of such employer." Under ERISA, a "qualifying employer security" is an "employer security" that is either a stock, a marketable obligation (e.g., a bond) or an interest in a publicly traded partnership.  *See* ERISA § 407(d)(5), 29 U.S.C. § 1107(d)(5).

94.     After SSE's spinoff from Chesapeake, Chesapeake was an independent company that did not own or control SSE. *See* Chesapeake's 2014 10-K at p. 12. Moreover, Chesapeake also did not act as the "employer" for the Plan's participants. For example, Chesapeake did not pay participants' wages, make contributions to the Plan or otherwise act in SSE's interests concerning the Plan. *See* Seventy Seven's 2014 10-K at p. 12 ("In connection with the spinoff, (Seventy Seven) and Chesapeake entered into an employee matters agreement, which provides that each . . . has responsibility for its own employees and compensation plans."); *see also* Plan's 2014 Financial Statements at p. 11 (classifying SSE, but not Chesapeake, as a "party-in-interest" under ERISA § 3(14), 29 U.S.C. § 1002(14)).  Accordingly, Chesapeake was not an "employer" of Plan participants under ERISA.

95.     Chesapeake was also not an "affiliate" of SSE after the spin-off and, therefore, its stock does not fall within ERISA's definition of "qualifying employer security."  ERISA § 407(d)(7), 29 U.S.C. § 1107(d)(7) provides that a corporation is an "affiliate" of an employer if it is a member of a "controlled group of corporations," a term defined as when a parent corporation owns stock possessing at least 50% of the subsidiary's voting power or when five or fewer individuals, estates or trusts own stock possessing at least 50% of each corporation's voting power.  *Id*. citing 26 U.S.C. § 1563. After the spin-off, SSE was an independent, publicly-traded company in which Chesapeake had "no ownership interest." *See* Chesapeake's 2014 10-K at 12. Accordingly, SSE and Chesapeake were not "affiliates" after the spin-off occurred on June 30, 2014.

## DEFENDANTS WERE FIDUCARIES

96.     ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

97.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who perform fiduciary functions for a retirement plan. A person or entity is considered a fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

98.    Each of the Defendants was a fiduciary within the meaning of ERISA §
3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i) as either a named or a *de facto* fiduciary with
respect to the Plan, and each owed fiduciary duties to the Plan and its participants under
ERISA.

99.    The Committee was the Plan administrator (*see*, *e.g.*, Plan's 2014 Financial
Statements (ECF 45-1) at 4) after the Plan became effective and, as such, had "complete
control of the administration of the Plan," including "complete discretion to construe or
interpret the provisions of the Plan." *See* Plan Document (ECF 45-3) at § 9.01. Moreover,
the Committee had the ability to "establish the funding policy of the Plan and to determine
the appropriate methods of carrying out the Plan's objectives." *Id*. at § 4.01. This power
included the ability to decide which investment options were available for Plan
participants' accounts. *See* ECF 45-3 at 10.

## DEFENDANTS' FIDUCARY DUTIES

100.    Under ERISA, those responsible for the management and operation of a plan
are fiduciaries and these fiduciaries owe participants the highest duties known to law.
These duties include, among others, the duty of loyalty, the duty of prudence, the duty of
diversification, and the duty to monitor.  ERISA § 404, 29 U.S.C. § 1104.

101.    Duty of Loyalty.  Under ERISA § 404(a)(1)(A)(i) 29 U.S.C. § 1104(a)(1)(A),
"a fiduciary shall discharge his duties with respect to a plan **solely in the interest of the
participants** and beneficiaries and . . .  for **the exclusive purpose of . . .  providing
benefits to participants** and their beneficiaries."  (emphasis added).  Thus, a fiduciary

must act with one and only one purpose and must act to further one and only one interest. This is often called the "exclusive benefit rule."

102. <u>Duty of Prudence</u>. Under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with **the care, skill, prudence, and diligence** under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." (emphasis added).

103. <u>Duty of Diversification</u>. Under ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C), "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

104. <u>Duty to Monitor</u>. In addition to the duty to prudently select investments, a fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1829.

## <u>CLASS ACTION ALLEGATIONS</u>

105. Plaintiff brings this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to

Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the

Plan, Plaintiff, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Seventy Seven Energy Inc. Retirement & Savings Plan at any time from July 1, 2014 to December 31, 2017, inclusive (the "Class Period"), and whose Plan accounts included investments in Chesapeake.

106.    The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiff at this

time, and can only be ascertained through appropriate discovery, 5,200 people became SSE

employees as a result of the spinoff on July 1, 2014 and, according to the Plan's public

filings, there were 5,501 participants in the Plan at the end of 2014.   Accordingly, Plaintiff

believes there are approximately 5,000 participants in the Plan during the Class Period and

whose Plan accounts included Chesapeake stock.

107.    Multiple questions of law and fact common to the Class exist, including, but

not limited to:

a.    whether Defendants each owed a fiduciary duty to the Plan, Plaintiff,

and members of the Class;

b.    whether Defendants breached their fiduciary duties to the Plan,

Plaintiff, and members of the Class by failing to act prudently and solely in the interests of

the Plan and the Plan's participants and beneficiaries;

c.    whether Defendants violated ERISA; and

d.    whether the Plan, Plaintiff, and members of the Class have sustained

damages and, if so, what is the proper measure of damages.

108.    Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' uniform wrongful conduct in violation of ERISA as complained of herein.

109.    Plaintiff will fairly and adequately protect the interests of the Plan and members of the Class because they have no interests antagonistic to or in conflict with those of the Plan or the Class. In addition, Plaintiff has retained counsel skilled and experienced in class action litigation, complex litigation, and ERISA litigation.

110.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

111.    Class action status is also warranted under Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty of Prudence)

112.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 111, above.

113.    Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.

114.    Defendants breached their duty of prudence by wrongfully allowing the Plan to continue to invest in Chesapeake stock.  They did not investigate the prudence of continuing to include Chesapeake stock as an investment option or follow an appropriate procedure when making their decision.  Rather, they included Chesapeake stock as an investment option because they erroneously believed that it was a "qualifying employer security" for Plan participants under ERISA, ignoring the plain information that including Chesapeake stock was not a prudent choice "(1) to maximize retirement savings for participants while (2) avoiding unnecessary risk." *Dudenhoeffer*, 134 S.Ct. at 2467.

115.    By continuing to include Chesapeake stock in the Plan, Defendants failed to consider the "circumstances then prevailing" and the "character and aims" of the Plan. Defendants instead wrongfully adopted the reasons why the CHK Plan offered Chesapeake stock.

116.    Because it was an undiversified single-stock fund, and therefore far riskier than a diversified investment, a prudent fiduciary would not have continued investing Plan

36

assets in the Chesapeake stock fund. There was *no reason* to believe that the Plan would receive better-than-average returns to compensate for the extreme risk of such a concentrated investment. To the contrary, there was every reason to believe that Chesapeake would *underperform* the market.

117. Defendants also breached their duty of prudence by having the Plan acquire *additional* shares of Chesapeake stock in both the second half of 2014 and again in 2015 when, again, there was no reason to believe that the Plan would receive better than average returns to compensate for the concentration risk inherent in a single-stock fund investment..

118. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty To Diversify)

119. Plaintiff incorporates by reference the allegations in paragraphs 1 through 118, above.

120. Defendants also breached their duty to diversify by failing to liquidate the Chesapeake stock transferred from the CHK Plan and map it to other, diversified Plan options. Defendants knew or should have known that having over 44% of the Plan's assets in an undiversified single-stock fund exposed the Plan to the "risk of large losses." ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C). Defendants ignored these obvious risks because of their erroneous belief that they did not have to comply with ERISA's mandated duties.

121.    Defendants also breached their duty to diversify Plan assets by having the Plan acquire *additional* shares of Chesapeake stock in both the second half of 2014 and again in 2015.

122.    The Defendant's failure to liquidate Chesapeake stock, and indeed, to acquire *more* of it, was even more egregious because the Plan also provided a fund that invested only in SSE's own stock, and SSE's performance was correlated with, and heavily dependent on, Chesapeake's performance.

123.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty to Monitor)

124.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 123, above.

125.    As alleged above, Defendants' duties included administering the Plan, managing the Plan's assets and reviewing the Plan's investment options to ensure they remained prudent. Defendants had "a continuing duty of some kind to monitor investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1829.

126.    These duties required Defendants to manage the Plan's assets for the sole and exclusive benefit of participants and beneficiaries and with the care, skill, diligence,

and prudence required by ERISA and evaluating the merits of the Plan's investments on an ongoing basis to ensure that the Plan's assets were invested prudently.

127. According to the United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) he has acted accordingly.

128. Defendants had a duty to follow an appropriate procedure to evaluate Chesapeake stock as an investment in the Plan. They failed to conduct an appropriate investigation of the merits of continued investment in Chesapeake. Contrary to their duties and obligations under the Plan Document and ERISA, Defendants failed to prudently manage the assets of the Plan. Specifically, during the Class Period, Defendants knew or should have known that Chesapeake was not, and had never been, a suitable and appropriate investment for the Plan. Nonetheless, during the Class Period, Defendants continued to permit the Plan to invest in Chesapeake, even when it greatly underperformed its benchmark and comprised more than 40% of the Plan's assets.

129. Defendants could not possibly have acted prudently when they continued to offer or invest the Plan's assets in Chesapeake stock because, among other reasons:

<blockquote>

(a)    they knew of and/or failed to understand that Chesapeake stock was not a qualifying employer security;

(b)    they knew of and/or failed to investigate Chesapeake as alleged above; and

</blockquote>

(c)   The risk associated with the investment in Chesapeake during the Class Period was by far above and beyond the normal, acceptable risk for retirement plan investments given the Plan's massive concentration.

130.   Knowing these extraordinary risks, Defendants had a duty to remove the Chesapeake stock as an investment option for the Plan's participants and prohibit the Plan or any participant from investing the Plan's assets in Chesapeake stock.

131.   Defendants also breached their fiduciary duties by failing to diversify Plan investments.   Defendants were required to diversify the Plan's investments "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."   *See* ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).   Defendants acknowledged the substantial risk of investing in a single security and that it involved a "higher degree of volatility" and "a higher degree of risk."   *See* Plan Prospectus (ECF 45-1) at 34.   Despite acknowledging this risk, Defendants allowed the Plan to continue to invest a high percentage of the Plan's assets in Chesapeake stock. They then allowed the Plan to invest ***millions more*** in Chesapeake stock in 2014 and throughout 2015.

132.   Despite the power and ability to do so, Defendants did not take any actions to diversify the Plan's assets. Defendants' failure to properly diversify the Plan's assets caused the Plan to suffer tens of millions of dollars in losses during the Class Period.

133.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## FOURTH CAUSE OF ACTION
### (Co-Fiduciary Liability)

134.   Plaintiff incorporates by reference the allegations in paragraphs 1 through 133, above.

135.   ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. Defendants breached all three provisions.

136.   ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. As alleged above, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

137.   ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Defendants knowingly participated in the each others' breaches because, as alleged above, they participated in the management of the Plan's improper investment in Chesapeake stock and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

138.    ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

139.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other participants and beneficiaries, lost millions of dollars of retirement savings.

140.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), each of the Defendants is liable to restore the losses to the Plan caused by their breaches of the fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

141.    The Plan suffered millions of dollars in losses because Plan assets were imprudently invested in the stock of one company, Chesapeake, in breach of Defendants' fiduciary duties.

142.    Had Defendants properly discharged their fiduciary duties and/or their co-fiduciary duties, the Plan and its participants would have avoided a substantial portion of the losses suffered through the Plan's continued investment in Chesapeake's stock. The Plan should have divested itself of Chesapeake stock immediately following the spin-off and avoided any purchase of Chesapeake stock throughout the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.      A Declaration that Defendants have breached their ERISA fiduciary duties to the participants;

B.      An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from their breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the Plan and participants would have made if Defendants had fulfilled their fiduciary obligations;

C.      An Order enjoining each of the Defendants from any further violations of their ERISA fiduciary obligations;

D.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investments;

E.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

H.      An Order for equitable restitution and other appropriate equitable and injunctive relief against all Defendants.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims that may be tried before a jury.

Dated: September 28, 2020

Respectfully submitted,

  */s/ James L. Colvin, III*

**LATHAM, STEELE, LEHMAN, KEELE,
RATCLIFF, FREIJE & CARTER, P.C.**
Bob L. Latham, OBA No. 15799
James L. Colvin, III, OBA No. 20654
1515 E. 71st Street, Suite 200
Tulsa, Oklahoma 74136
Telephone:  918.382.7523
Facsimile:  918.970.2002
E-mail:  blatham@law-lsl.com
E-mail:  jcolvin@law-lsl.com

**BAILEY & GLASSER LLP**
Gregory Y. Porter (to be admitted *pro hac vice*)
Ryan T. Jenny (to be admitted *pro hac vice*)
Mark G. Boyko (to be admitted *pro hac vice*)
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
E-mail: gporter@baileyglasser.com
E-mail: rjenny@baileyglasser.com
E-mail: mboyko@baileyglasser.com

**IZARD KINDALL & RAABE LLP**
Robert A. Izard (to be admitted *pro hac vice*)
Mark P. Kindall (to be admitted *pro hac vice*)
Douglas P. Needham (to be admitted *pro hac vice*)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
E-mail: rizard@ikrlaw.com
E-mail: mkindall@ikrlaw.com
E-mail: dneedham@ikrlaw.com
**Attorneys for Plaintiff**